GUILLERMO AILLON *v.* STATE OF CONNECTICUT

HOUSE, C. J., LOISELLE, MACDONALD, BOGDANSKI and LONGO, Js.

Argued March 11—decision released June 3, 1975

*Jerrold H. Barnett,* assistant state's attorney, with whom was *Robert E. Beach, Jr.,* office of chief state's attorney, for the appellant (state).

*Howard A. Jacobs,* special public defender, for the appellee (plaintiff).

BOGDANSKI, J.    The plaintiff, Guillermo Aillon, was found guilty of three counts of murder after a jury trial.    In November of 1973, the plaintiff learned from certain newspaper articles that the judge who presided at his trial had engaged in an ex parte conversation with a juror after the case had been submitted to the jury.    The plaintiff thereupon filed a petition for a new trial pursuant to § 52-270 of the General Statutes.    After a hearing on that petition, the court concluded that a new trial should be granted and from the judgment rendered the state has appealed to this court.    The state has assigned error in the court's refusal to find material facts claimed to be admitted or undisputed, in finding certain facts without evidence, in finding facts of doubtful meaning, in the conclusions reached, in rulings on evidence, and in the overruling of its claims of law.

The finding[1] discloses that the voir dire of prospective jurors for the plaintiff's trial began on May 18, 1973.    On June 26, 1973, the selection of twelve jurors and two alternates was completed. The actual trial commenced on July 5, 1973, and the presentation of evidence, including the testimony of sixty witnesses, lasted until August 22,

---

[1] While the state has taken great care to preserve for our review most of its assignments of error directed at the finding of facts, a thorough examination of the appendix to its brief leads us to conclude that no additions or corrections are warranted. The requested corrections are directed at findings that are both supported by the evidence and clearly understandable; and the requested additions to the finding are not "admitted or undisputed" facts or are not material in that they will not affect the result.    See Practice Book § 628; *Anderson* v. *Pension & Retirement Board,* 167 Conn. 352, 353 n.1, 355 A.2d 283.

1973. On August 27, 1973, the jury heard the closing arguments and, the next day, the court charged the jury. The two alternates were then dismissed and the jury began its deliberations. Those deliberations lasted until 8:20 p.m. on August 28, 1973, and continued on the next two days from 10:00 a.m. until 10:10 p.m. and from 10:00 a.m. until 10:55 p.m., respectively. On Friday, August 31, the jury again resumed their deliberations at 10:00 a.m. and at 7:45 p.m. were recalled to the courtroom after the jury foreman had written a note to the trial judge which stated that the jury was unable to "come to a unanimous decision."

The trial court then gave the jury supplemental "Chip Smith" instructions; see *State* v. *Smith,* 49 Conn. 376, 386; concluding with the following charge: "Ladies and gentlemen of the jury, I now ask you to return to the jury room and to return a verdict if at all possible, whether tonight, tomorrow or the next day, but to continue your honest deliberations, as you have in the past and try to arrive at a conclusion." Counsel for the plaintiff objected to the giving of the "Chip Smith" charge, but he raised no objection to the resumption of deliberations by the jury.

Two hours later, there was a discussion in the jury room concerning whether the jurors should remain and continue their deliberations or whether they should adjourn and return the next day. The procedure used by the jury on previous evenings to determine when they would adjourn was to reach an informal consensus, rather than to take a formal, written vote. One of the jurors, Kathleen Read, who had moved to Massachusetts during the course of the trial, wished to continue deliberations that evening in the hope of reaching a verdict so that

she might return home to her family. At 10:00 p.m. she asked to see the judge and the jury foreman wrote a note stating that one of the jurors wished to speak with him "with regard to a personal matter." A short time later, the trial judge, accompanied by the sheriff, appeared at the doorway of the jury room, and juror Read started to relate her problem to the judge. The judge, however, requested that she step out and he escorted her to the back of the jury box. The ensuing conversation lasted only a few minutes. Juror Read, who appeared nervous and upset, explained that she wanted to go home to Massachusetts but that some of the jurors wanted to adjourn for the evening although she and others wanted to continue deliberating. She then asked the judge, "Can we stay?" The judge responded, "Yes, you can stay."

The other jurors could not hear the conversation, although one juror testified that he thought he heard the trial judge say, "You have to stay." What juror Read said on her return to the jury room is disputed, but some jurors felt that she said the judge had told them to remain; others felt that the judge merely indicated that they could stay. At any rate, when the foreman asked what the trial judge had said, juror Read responded, in the presence and hearing of the other jurors, "We can stay or we can go home but if we go home we come back tomorrow, the next day and the next day." The jury thereupon continued deliberating. Six hours later, at 4:25 a.m. on Saturday, September 1, 1973, the jury reached their verdict of guilty on each of the three counts of murder.

Although the plaintiff and his counsel were present in the courthouse at all times on the evening in

question, the trial judge did not inform them of either the note or the ensuing conversation with juror Read.

On the basis of the foregoing, the court concluded that any communication between a trial judge and members of a jury in the absence of an accused and his counsel is an extraneous influence which is presumptively prejudicial to the accused unless the state can overcome the presumption by showing that the communication was "harmless beyond a reasonable doubt." In determining that the state had failed to meet its burden of proof, the court stated its ultimate conclusion as follows: "Considering the length of time the jury had been deliberating, the reference to deliberating the following day and the next in the supplemental instructions, the lateness of the hour and the obvious weariness and strain some of the jurors must have felt, the court was not satisfied beyond a reasonable doubt that the conduct of the judge did not lead the jury to follow a course which was prejudicial to the plaintiff."

The state has assigned error in those conclusions, claiming that not all communications between the trial judge and the jury in the absence of the accused are presumptively prejudicial. The state argues that the judge merely repeated his previous instructions to the jury that they should continue their deliberations, and that any error in so doing was harmless.

It has long been the law of this state that jurors shall not converse with any person, not a member of the jury, regarding the cause under consideration; *Bennett* v. *Howard,* 3 Day 219, 223; *Tomlinson* v. *Derby,* 41 Conn. 268, 274; and that no person may

be present with or speak to the jurors when they are assembled for deliberation; *Cook* v. *Miller,* 103 Conn. 267, 273, 130 A. 571. General Statutes § 51-245. Those rules are of vital importance to assure that the jury will decide the case free from external influences that might interfere with the exercise of deliberate and unbiased judgment. "Nor can any ground of suspicion that the administration of justice has been interfered with be tolerated." *Mattox* v. *United States,* 146 U.S. 140, 149, 13 S. Ct. 50, 36 L. Ed. 917.

It has thus become a universally accepted principle that communications between a judge and a jury, especially after the jury have begun deliberations, should be made only in open court in the presence of the parties. See 75 Am. Jur. 2d, Trial, § 1001; annot., 41 A.L.R.2d 227. In a criminal trial this rule takes on constitutional dimensions since the accused has a right to be present at every stage of the trial and to have the assistance of counsel for his defense. U.S. Const., amend. VI, XIV; *Illinois* v. *Allen,* 397 U.S. 337, 338, 90 S. Ct. 1057, 25 L. Ed. 2d 353; *United States* v. *Wade,* 388 U.S. 218, 226, 87 S. Ct. 1926, 18 L. Ed. 2d 1149; *State* v. *Ralls,* 167 Conn. 408, 419, 356 A.2d 147; see *Shields* v. *United States,* 273 U.S. 583, 588, 47 S. Ct. 478, 71 L. Ed. 787. Moreover, the accused's right to a fair trial in a fair tribunal is the very foundation of due process. "[T]he requirement of due process of law in judicial procedure is not satisfied by the argument that men of the highest honor and the greatest self-sacrifice could carry it on without danger of injustice. Every procedure which would offer a possible temptation to the average man . . . to forget the burden of proof required to convict the defendant, or which might lead him

not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law." *Tumey* v. *Ohio,* 273 U.S. 510, 532, 47 S. Ct. 437, 71 L. Ed. 749; *Estes* v. *Texas,* 381 U.S. 532, 543, 85 S. Ct. 1628, 14 L. Ed. 2d 543.

To preserve those rights of the accused, some jurisdictions have held that any communication between the trial judge and a deliberating jury in the absence of the accused and his counsel requires a new trial, whether or not the communication was prejudicial. See, e.g., *Hoberg* v. *State,* 3 Minn. 262, 269–70, 3 Gil. 181, overruled, *Oswald* v. *Minneapolis & N.W. Ry. Co.,* 29 Minn. 5, 11 N.W. 112; *State* v. *Murphy,* 17 N.D. 48, 61, 115 N.W. 84; 58 Am. Jur. 2d 316, New Trial, § 110, and cases cited therein. See also *State* v. *Werring,* 111 Ariz. 68, 523 P.2d 499; *State* v. *Cowman,* 212 N.W.2d 420, 424 (Iowa). In other jurisdictions the accused must show that he was prejudiced in order to obtain a new trial. See, e.g., *People* v. *Lee,* 38 Cal. App. 3d 749, 755, 113 Cal. Rptr. 641; *People* v. *Davis,* 516 P.2d 120, 121 (Colo.); *People ex rel. Walker* v. *Pate,* 53 Ill. 2d 485, 505, 292 N.E.2d 387; *State* v. *Schifsky,* 243 Minn. 533, 543, 69 N.W.2d 89.

In this state, an improper act of a judge does not automatically justify a new trial unless there has been prejudice to the unsuccessful party; *Wood* v. *Holah,* 80 Conn. 314, 316, 68 A. 323; and ordinarily the burden of establishing that an error of the trial court is harmful rests on the appellant. *State* v. *L'Heureux,* 166 Conn. 312, 323, 348 A.2d 578; *State* v. *Vennard,* 159 Conn. 385, 393, 270 A.2d 837, cert. denied, 400 U.S. 1011, 91 S. Ct. 576, 27 L. Ed. 2d 625. In this case, however, we are dealing with an intrusion into the constitutional rights of an

accused. Thus, the accused is not required to show that the constitutional error was harmful; rather, the state must show that it was harmless beyond a reasonable doubt. *Chapman* v. *California,* 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705.

We conclude that the court applied the proper rule of law, and that it was incumbent upon the state to rebut the presumption of prejudice created by the trial judge's ex parte communication with the jury. See *United States ex rel. Tobe* v. *Bensinger,* 492 F.2d 232, 238 (7th Cir.); *Bustamante* v. *Eyman,* 456 F.2d 269, 273 (9th Cir.); *State* v. *Pokini,* 526 P.2d 94, 105, 107 (Hawaii); *State* v. *Saul,* 258 Md. 100, 108, 265 A.2d 178; *State* v. *White,* 191 Neb. 772, 774, 217 N.W.2d 916; *State* v. *Brugger,* 84 N.M. 135, 137, 500 P.2d 420; *Badgwell* v. *State,* 418 P.2d 114, 118 (Okla. Crim. App.). Whether the state met its burden of showing that the communication was harmless beyond a reasonable doubt is a close question on the facts of this case.[2] We need not, however, decide whether the court properly exercised its discretion in ordering a new trial for the plaintiff, since certain rulings on evidence, assigned as error by the state, excluded testimony that had a direct bearing on the state's burden of proof.

At the beginning of the hearing on the plaintiff's petition for a new trial, the state objected to any

---

[2] It is true that the trial judge did little more than repeat his earlier instructions that the jury should continue deliberations, but it is not so clear how juror Read repeated those instructions. See *Ah Fook Chang* v. *United States,* 91 F.2d 805, 808 (9th Cir.). Nor is it so clear what course of action would have been taken if the plaintiff and his counsel had been advised that juror Read had raised a question about the length of deliberations. See *United States* v. *Dellinger,* 472 F.2d 340, 377–80 (7th Cir.), cert. denied, 410 U.S. 970, 93 S. Ct. 1443, 35 L. Ed. 2d 706.

testimony being received from the jurors as to what had transpired in the jury room on the ground that such testimony was inadmissible to upset the verdict. The state's objection was based on this court's early approval of the rule adopted by Lord Mansfield in *Vaise* v. *Deleval,* 1 T.R. 11 (K.B. 1785), that evidence of juror misconduct or mistake could not be received from a juror to set aside his own verdict. *State* v. *Freeman,* 5 Conn. 348, 350, 352. Accord, *Valentine* v. *Pollak,* 95 Conn. 556, 558–59, 111 A. 869; *Haight* v. *Turner,* 21 Conn. 593, 596; *Meade* v. *Smith,* 16 Conn. 346, 356. After reviewing briefs submitted by the parties on that issue, the court stated that it "agrees with the State that there is a long line of early Connecticut cases holding the testimony of jurors cannot be received to set aside a verdict on the ground of mistake or misconduct on the part of the jurors. However, the court feels that that line of cases should be and is distinguished from taking testimony as to the fact of extraneous influences, although not evidence as to the effect on the deliberations or influence on the mental process of the jurors. . . . The court will accept testimony from the jurors as to the facts of extraneous influence but it will not receive evidence as to the effect that this influence may have had on the deliberations or on the mental process of any individual juror or group of jurors. The court feels that it must apply an objective test, assessing for itself, whether or not, there is a likelihood that that influence would affect a jury outcome. On that basis the objection of the State is overruled."

Insofar as that ruling abandoned the extension of Lord Mansfield's rule that a juror is always incompetent to testify in impeachment of his verdict, it was correct. As noted in *State* v. *Freeman,*

supra, 351–52, the various policies behind the rule were to give stability to the verdicts of jurors, to minimize the temptation for jury-tampering, and to prevent inquisition into the arguments and reasoning of the jurors that go into their ultimate verdict. Those policies are served equally as well by a narrower rule "which excludes, as immaterial, evidence as to the expressions and arguments of the jurors in their deliberations and evidence as to their own motives, beliefs, mistakes and mental operations generally, in arriving at their verdict." McCormick, Evidence (2d Ed.) § 68, p. 148. That rule has been aptly described as applying the parol evidence rule to a jury's verdict, so that their outward verdict as finally and formally made, and not their prior and private intentions, is taken as exclusively constituting the act.[3] 8 Wigmore (McNaughton Rev.), Evidence §§ 2348, 2349.

On the other hand, the rule does not prohibit juror testimony regarding the failure to obey certain essential formalities of juror conduct, i.e., irregularities and misconduct extraneous to the mental operations of the jury. See, generally, Wigmore,

---

[3] "Accordingly, it is today universally agreed that on a motion to set aside a verdict and grant a new trial the verdict cannot be affected, either favorably or unfavorably, by the circumstances: that one or more jurors misunderstood the judge's instruction; or were influenced by an illegal paper or by an improper remark of a fellow juror; or assented because of weariness or illness or importunities; or assented under an erroneous belief that the judge would use clemency or have the legal right to vary the sentence; or had been influenced by inadmissible evidence; or had decided upon grounds which rendered newly discovered evidence immaterial; or had omitted to consider important evidence or issues; or had miscalculated accounts by errors of fact or of law; or had by any other motive or belief been led to their decision." (Emphasis omitted.) 8 Wigmore (McNaughton Rev.), Evidence § 2349, and cases cited therein.

op. cit., §§ 2352, 2353, 2354; 76 Am. Jur. 2d, Trial, §§ 1219-1229. See, also, *Mattox* v. *United States,* 146 U.S. 140, 149, 13 S. Ct. 50, 36 L. Ed. 917. Thus, any conduct in violation of § 51-245 of the General Statutes may be established by the testimony of a juror. As early as 1866 it was recognized "[t]hat affidavits of jurors may be received for the purpose of avoiding a verdict, to show any matter occurring during the trial or in the jury room, which does not essentially inhere in the verdict itself, as that a juror was improperly approached by a party, his agent, or attorney; that witnesses or others conversed as to the facts or merits of the cause, out of court and in the presence of jurors; that the verdict was determined by aggregation and average or by lot, or game of chance or other artifice or improper manner." *Wright* v. *Illinois & Miss. Tel. Co.,* 20 Iowa 195, 210. And, as Justice William J. Brennan, Jr., stated: "Evidence of the actual effect of the extraneous matter upon jurors' minds can and should be excluded, as such evidence implicates their mental processes, but receiving their evidence as to the existence of the condition or the happening of the event . . . supplies evidence which can be put to the test of other testimony (and thus sound policy is satisfied) and at the same time the evidence can serve to avert . . . a grave miscarriage of justice, which it is certainly the first duty of a court of conscience to prevent if at all possible." *State* v. *Kociolek,* 20 N.J. 92, 100, 118 A.2d 812; see *Perry* v. *Bailey,* 12 Kan. 539, 544.

There was, then, no error in receiving juror testimony regarding the ex parte conversation between the trial judge and juror Read and juror Read's statements upon her return to the jury room. That testimony did not implicate the mental processes

of the jurors as long as they were prevented from giving evidence of the actual effect that it had on their minds.

Subsequent to the court's ruling on the reception of juror testimony, the state established, during cross-examination of juror George Kudasch, that the procedure used by the jury to determine whether they would adjourn their deliberations was to reach an informal consensus, and that no formal vote was taken. The court accepted that statement in its findings of fact. The state then asked juror Kudasch whether there had been a consensus among the jurors regarding adjournment at the time juror Read went to speak to the trial judge. Juror Kudasch answered, "We were talking about that, whether we should adjourn and come back the next day, but the general feeling was to finish it—finish the job that night—or that morning." The state then asked if it was the general feeling of the jurors to remain, to which juror Kudasch responded, "Yes." The plaintiff's counsel then objected and moved to strike the answer as "incompetent within the framework of your Honor's ruling." The court agreed, ruling that the question and answer went to the mental processes of the jurors. The state took no exception to that ruling.

Later in the hearing, during direct examination of juror Gerard Roy, the attorney for the state asked if the conversation between juror Read and the judge could be heard inside the jury room. Juror Roy responded, "No, sir, because, of course, everybody was mumbling and talking and we were still discussing what we were talking about before, whether we should stay or go home." The plaintiff's counsel then objected; the court sustained the objec-

tion because the answer was "getting into the deliberations of the jury"; the answer was stricken; and the state took exception to the ruling.

Since the state took no exception to the exclusion of juror Kudasch's testimony, it has not assigned that ruling as error. The state has, however, assigned error in the restriction of juror Roy's testimony. The state claims that once the court ruled that juror testimony was permissible to show the occurrence of an irregularity, it should have permitted the state to show the existence of a condition that would mitigate the prejudicial effect of that irregularity. As that claim relates to the evidence excluded in this case, we must agree.

The excluded testimony dealt only with whether the jurors had reached a consensus to remain or adjourn before juror Read returned from her ex parte conversation with the trial judge. The decision to continue deliberations, if it had been made, is one that does not "inhere" in the verdict or implicate the arguments of the jurors. It does not in any way bring forth the motives, beliefs or mental operations of the jurors in arriving at their verdict. Rather, one juror's testimony that a consensus had been reached to remain or to adjourn is an objective, controvertible fact that can be put to the test of the other jurors' testimony.

The harmfulness of the ruling is apparent. In its ultimate conclusion the court stated that it was "not satisfied beyond a reasonable doubt that the conduct of the judge did not lead the jury to follow a course which was prejudicial to the plaintiff." The court was concerned with the lateness of the hour, the length of jury deliberations and, implicitly, with the coercive effect that the ex parte conversa-

tion may have had on the jurors. See *Rice* v. *United States*, 356 F.2d 709, 717 (8th Cir.). That concern might well have been reduced if the state had been able to establish that the jurors had reached a consensus to continue their deliberations before juror Read returned from her conversation with the judge. Whether the evidence would show that a consensus had been reached, or whether such a showing would have led the court to a different conclusion, is not for this court to decide. It is enough that the evidence sought to be elicited by the state was improperly excluded and that that evidence had a direct bearing on the state's burden of proof. Because of that erroneous ruling on evidence, we are constrained to order a new hearing on the plaintiff's petition for a new trial.

There is error, the judgment is set aside and the case is remanded for further proceedings in accordance with this opinion.

In this opinion the other judges concurred.